McCALEB, Justice.
Plaintiff, Dr. Cecil O. Lorio, instituted this suit[1] for recovery on a windstorm policy issued by defendant company insuring a quarter horse, known as “King So Big”, for $10,000. This horse died after he developed acute laminitis (founder) as a result of overeating wheat four days after he had been quartered in a barn which had been damaged by Hurricane “Betsy” on September 9, 1965. It is contended by plaintiff that the death of his horse is covered under his policy which insured against loss “ * * * directly resulting from or made necessary by” windstorm.
Dr. Lorio, the owner of this registered quarter horse stallion as well as other horses, operated a farm outside of Baton Rouge known as Viola Farms, on which was located an “L” shaped barn used for the housing of these animals. On the night of the hurricane, King So Big was placed in an open lot. The next morning the barn was inspected and found to be damaged to the extent of having one part blown down. Dr. Lorio and his son, who was in charge of the farm, made a visual inspection of the remaining portion, which was still standing, and thereafter placed this animal in the stall next to the feed stall where a 100 pound bag of wheat was standing, along with other cattle feed. On the fourth day after the hurricane, King So Big was found lying in his stall and suffering from founder. It was discovered that two boards of the side wall of the stall had been kicked off by the horse in order to gain access to'.the wheat and eat thereof. This resulted in the illness from which he died in January of 1966.
The theory of plaintiff’s case is stated in paragraph 8 of his petition, as follows:
*726 “Petitioners now show that the death of ‘King So Big’ was caused solely by and and as a direct result of the windstorm damage caused during Hurricane Betsy in that it was not theretofore possible for the animal to obtain any feed stored in the building adjacent to the one in which he was ordinarily quartered prior to the hurricane; that because of the complete demolition of his regular quarters in that building in which the stallion was ordinarily stabled, it became necessary, in fact mandatory, to stable him in the only other available building, so as to protect him from the elements; knowledge of the fact that the second building would not safely house petitioners’ stallion was then unknown to petitioners; that had not the adjacent building been weakened by the hurricane the animal would not have been able to push through the stall wall to gain access to the wheat stored in the next stall and therefore, would not have developed ‘founders’ and died.”
Defendant denied liability under its policy and further pleaded that the death of King So Big was due to plaintiff’s negligence in placing the horse in a temporary stall suspected of being structurally weakened by the hurricane and adjacent to a stall in which there was known to be a large quantity of wheat and other feed, thus exposing the horse to the obvious danger of food founder. -
On the trial of the case, Dr. Lorio’s deposition was admitted in evidence and he also gave oral testimony. His son, Robert, who operated the ranch, also testified substantially to the same state of facts related by his father. Dr. Lorio stated that the stall in which King So Big was placed was visually inspected by him and that, while he did not check the strength of the walls and building, he examined it to see if nails were protruding. Dr. Lorio admitted that wheat was stored in the next stall but explained that he had no reason to believe that the animal would kick his way through the wall which appeared secure at the time. When questioned concerning the construction of the stall, he said that the side wall was made up of slatted boards spaced four inches apart; that the horse could see through the slats and smell the feed, and that an inspection of the stall after the horse was found ill disclosed that two slats were “pawed off” and this was enough to> allow his head and neck to protrude into the feed stall and pull the sack of wheat over so that he could eat freely.
In the lower court there was judgment in favor of plaintiff for $10,000, the limit of the policy, the trial judge being of the opinion that the horse would not have died except as a direct result of Hurricane “Betsy.” However, on appeal to the Court of Appeal, First Circuit, the judgment was reversed, the court reasoning that the provision of the policy insuring against loss *728 “directly resulting from” windstorm is clear and unambiguous and means a death resulting from some event “which is caused by or is a consequence of an event and which would have occurred without the existence or intrusion of other causes or conditions unrelated to the original event.” The court then found that the death of King So Big was the result of a number of circumstances of which Hurricane “Betsy” was only one; that the decision to place the horse in the stall next to the wheat, although not unreasonable, was another circumstance, for there were other stalls in which other horses were kept after the storm without ill effect, and that death would not have resulted if wheat had not been easily accessible in the adjoining stall. See 220 So.2d 781.
On application of plaintiff we granted certiorari and the case has been argued and submitted for our decision.
Counsel for plaintiff contend that the Court of Appeal erred in holding that the insuring clause “Death or destruction, directly resulting from or made necessary by: * * * (b) Windstorm * * * ” is clear and explicit; that, in law and in fact, the clause is ambiguous and doubtful and therefore should not be given a literal and restricted construction. They further declare that by according the provision a liberal interpretation, to which it is entitled under the well-settled jurisprudence, and in constructing the provisions of the policy favorably to the insured and against the insurer, there can be no doubt that under the facts of the case that the death of King So Big resulted from and was made necessary by Hurricane “Betsy.”
The Court of Appeal stated in its opinion that the term “directly resulting from” has not been heretofore interpreted by the courts of this State and that the phrase was of ordinary significance and should be applied in accordance with its plain meaning.
This latter conclusion would seem correct from a literal reading of the phrase in question. However, the appellate court is mistaken in its statement that insuring clauses similar to the one under consideration have not been heretofore construed by our courts. For a review of the authorities on the subject reveals that courts of last resort (including this Court) have consistently interpreted the term “direct loss”, as used in a windstorm insurance policy, to be a loss proximately caused by the peril insured against, the term having essentially the same meaning as “proximate cause” applied in negligence cases. See Dubuque Fire and Marine Insurance Co. v. Caylor, C.A.10th Cir., 249 F.2d 162; Federal Ins. Co. v. Bock, Tex.Civ.App., 1964, 382 S.W.2d 305; and see discussion of rule, Vol. 11 Couch on Insurance, 2d, sec. 42:337, p. 148.
In 45 C.J.S. Insurance § 888, p. 962, it is stated with reference to the insuring clause in policies covering loss by cyclone, *730 hurricane, storm, tornado, and windstorm that “ * * * In order that there may be a recovery on the policy, the cause designated in the policy must have been the proximate, and not a remote, cause of the loss, particularly where the policy requires it to be the ‘direct’ cause of the loss. * * ” And in Vol. 5 Appleman, Insurance Law and Practice, Sec. 3142, p. 287: Tornado and Windstorm Coverages, citing numerous authorities in support of the text, it is declared:
“Wind must be an efficient cause of loss in order to recover on a windstorm policy. And where the term 'direct’ is used, referring to the cause of loss, it means proximate or immediate. * * ”
See also 93 A.L.R.2d, Annotation, Windstorm Insurance — Causes of Loss, Sec. 8, p. 156, where it is stated that, although windstorm must be the dominant and efficient cause of the loss, the rule has been announced in a number of cases that “ * * if a windstorm is the dominant and efficient cause of the loss, the insured may recover notwithstanding that another cause or causes contributed to the damage suffered.”
The above-stated rule of construction has been applied in Roach-Strayhan-Holland Post v. Continental Ins. Co. (1959) 237 La. 973, 112 So.2d 680, where this Court observed:
“ * * * Moreover, since in a great number of factual situations it has been shown that wind is often not the sole contributing cause of the loss or damage, acceptance has been accorded the view that it is sufficient, in order to recover upon a windstorm insurance policy not otherwise limited or defined, that the wind was the proximate or efficient cause of the loss or damage, notwithstanding other factors contributing thereto. This is in line with the jurisprudence of our own State. * * * ”
The case of Bogalusa Gin & Warehouse, Inc. v. Western Assur. Co., 199 La. 715, 6 So.2d 740, is cited as authority for the foregoing statement.
Hence, concordant with the jurisprudence, the question for decision is one of fact, i. e., whether or not the proximate cause of the death of King So Big was occasioned by windstorm. Since the immediate cause of his death is attributable to overeating the wheat stored in the feed stall, the burden was on plaintiff to establish that the windstorm insured against, which occurred four days before the horse ate the wheat, was the cause in fact which precipitated the loss.
It is our view that on the facts before us the Court of Appeal was correct in holding that the windstorm was at most an indirect or remote cause of the animal’s death. Obviously, in the absence of convincing evidence to the contrary, if is dif- - ficult to perceive that the storm had prox *732 imate relation to the animal’s pushing down or breaking the slats of the stall in which he was stabled in order to gain access to the wheat in the adjoining stall, the eating of which is the primary cause of his death. Nor does the circumstance, that the windstorm made it necessary that the horse be temporarily quartered in the part of the “L” shaped barn which remained after the destruction of the part in which the animal was usually quartered, constitute a sound basis for concluding that his subsequent loss is attributable to the storm.
However, were the evidence sufficient to establish that the temporary stable used to quarter the horse was so weakened as a consequence of the storm that it enabled the horse to break through, kick out or push down the two slats of the partition between his quarters and the feed stall, then it would be proper to conclude that the windstorm provided him access to the feed in the adjoining stall and thus was the proximate cause of his subsequent death. This was the view of the district judge, who stated in his written reasons for judgment that, “ * * * except for the storm having weakened the stalls, the horse would have-been unable to have broken through to eat the wheat in the adjoining stall which caused his- condition that resulted in his death.” - - : •
THe-resolutión'of the judge is based-sole- • ly on the testimony of plaintif’s son, Robert' C. ■ Lorio. • - However, While it appears that Mr. Lorio voiced an opinion to this effect, we do not believe that his conclusion is supported by the known facts of the case. Mr. Lorio testified that, when it was decided to quarter the horse in the stall adjoining the feed stall, a visual examination was made by him and his father and there was nothing to indicate that the stall was unsafe to quarter the animal. But there is' no evidence which shows that, when it was discovered at a later date that the remaining part of the barn had been weakened and twisted on its foundation so that it had to be straightened and practically rebuilt, it was the weakened condition of the structure and not the desire for the feed that enabled the horse, a powerful stallion weighing 1,175 lbs., to kick or punch out the two slats on the side of the partition separating the horse stall from the feed stall. It is significant, too, that the evidence does not reveal that any of the other slats on the side of the partition separating the horse stall from the feed stall were damaged or displaced in any way by the. horse when he gained access to the feed, nór is there any evidence showing that any of the other horse stalls in the structurally weakened barn' sustained any physical damage whatever. Taken as a whole, it is our view that the testimony of plaintiff’s son, that the weakened condition of the remaining part of the barn structure enabled the horse to kick or push out the two slats, is a’ hindsight appraisal; an opinion resting *734 entirely upon speculation which is not supported by the facts.
Finally, counsel for plaintiff complain that the Court of Appeal did not consider the full phrase of the policy, i. e., “Death or destruction, resulting from or made necessary by: * * * (b) Windstorm.” The theory of this argument is that, inasmuch as the storm made it necessary to quarter the horse in the weakened remaining part of the barn, his death necessarily resulted from the windstorm.
This contention is fallacious. The quartering of the horse in a stall in the part of the barn which withstood the windstorm did not make necessary his death by windstorm ; it was the propensity of the horse to eat the wheat which ultimately caused his death, and this propensity was not made necessary by the storm nor was it a direct result thereof.
For the reasons assigned, the judgment of the Court of Appeal is affirmed.

. The suit was originally brought by Dr. Lorio and his son; Robert O. Lorio, but the latter’s claim was dismissed by summary .judgment in favor of tile defendant insurance company inasmuch as he' was not a named insured under the policy. •...