United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 15, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 04-30602

---

TIMES-PICAYUNE PUBLISHING CORPORATION,

Plaintiff-Appellant,

versus

ZURICH AMERICAN INSURANCE COMPANY,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Eastern District of Louisiana

---

Before GARWOOD, GARZA, and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

The Times-Picayune Publishing Corporation (Times-Picayune), a Louisiana citizen, brought suit against Zurich American Insurance Company (Zurich), a New York citizen, in the state court of Orleans Parish, Louisiana alleging various state law causes of action related to Zurich's refusal to pay the Times-Picayune, as an insured under a Zurich excess policy covering employee dishonesty, for certain embezzlement losses. Zurich removed the case to the

Eastern District of Louisiana, and the district court ultimately entered summary judgment in its favor.  We reverse.

## Facts and Proceedings Below

The material facts of this case are undisputed.

From January 1, 1995 until July 1, 2001, the Times-Picayune was insured under a series of six $1,000,000 primary insurance policies issued by Federal Insurance Company (Federal) that covered, among other things, acts of employee dishonesty.  The first of these primary policies ran from January 1, 1995, to July 1, 1996, and each subsequent policy was for a one year term beginning July 1, with the sixth and final primary policy running from July 1, 2000, to July 1, 2001.  Notably, the Federal primary polices each contemplated the possibility that surreptitious crimes like embezzlement might be perpetrated during the life of one policy but not discovered until sometime thereafter.  Each of the primary policies covered losses occurring during the policy period and required the insured to file proof of loss within 120 days after discovery of the loss.  Coverage extended to losses discovered within one year after the policy expired (the "discovery period").[1]  Importantly here, each primary policy *also* provided coverage on certain conditions for losses which occurred

---

[1] Each primary policy provided:
"DISCOVERY PERIOD
This insurance does not cover any loss, sustained by any insured, discovered later than one year following termination of this insurance in its entirety."

2

*prior* to the policy period, pursuant to a "Prior Loss" clause

reading as follows:

> "LOSS SUSTAINED PRIOR TO EFFECTIVE DATE
> If you were continuously insured by a policy prior to
> this insurance providing the same insurance as this
> policy, but cannot recover on a loss because that
> policy was terminated and its discovery period has run
> out, we will cover your loss provided:
>
> 1. this insurance would have covered your loss had it
> been in effect at the time the acts that caused the
> loss occurred; and
>
> 2. you discovered the loss within one year after this
> insurance is terminated.
>
> We will not pay more than the Limit of Insurance for
> the loss under the prior policy or under this insurance
> when it became effective, whichever is less. The amount
> we pay will be a part of this insurance, not in
> addition to it.
>
> If we have insured you under other policies whose
> discovery period had not run out when you discovered a
> loss that occurred partly under those policies and
> partly under this policy, we will pay up to the Limit
> of Insurance under this policy or the prior policies
> issued by us, whichever is less."

In January of 1995 a Times-Picayune employee named Arthur

Anzalone embarked on a six-year embezzlement scheme during which

he would eventually steal $2,205,879 from the Times-Picayune

until he was discovered in December of 2000. Over the course of

his crime, Anzalone stole: $536,428 during the term of Federal's

first primary policy (1/1/95 - 7/1/96); $268,871 during the

second policy (7/1/96 - 7/1/97); $234,707 during the third policy

(7/1/97 - 7/1/98); $330,647 during the fourth policy (7/1/98 -

7/1/99); $562,859 during the fifth policy (7/1/99 - 7/1/00); and

3

$272,367 during the sixth (and last) primary policy (7/1/00 – 7/1/01). Following the discovery of Anzalone's ongoing theft, the Times-Picayune timely made proof of loss and filed a claim with Federal under its sixth primary policy for both the losses incurred during that policy period as well as the previously undetected losses that were sustained while the preceding Federal primary policies were in effect. Though it did not admit liability, Federal in December 2001 settled with the Times-Picayune for the full policy limit of $1,000,000.

That settlement, however, left the Times-Picayune with $1,205,879 in embezzlement losses that were not reimbursed by Federal's primary policy. It was to recover this sum that the Times-Picayune turned to Zurich. In July of 1996, along with its second primary policy, the Times-Picayune also purchased from Federal a $1,500,000 excess policy that would cover, *inter alia*, acts of employee dishonesty exceeding the $1,000,000 policy limit of the underlying primary policy. The Times-Picayune renewed this one-year excess policy with Federal on July 1, 1997, but, on July 1, 1998, the Times-Picayune switched excess carriers and bought a three-year, $1,500,000 policy from Zurich that was effective from July 1, 1998 until July 1, 2001. The Times-Picayune timely filed an excess claim with Zurich for the $1,205,879 not covered by (because in excess of the policy limits of ) the Federal July 1, 2000 – July 1, 2001 primary policy.

4

Zurich balked, however.  First, although the Zurich excess policy itself contains no Prior Loss clause (nor any express limitation to losses after policy inception or exclusion of pre-policy losses), the third sentence of the excess policy's insuring clause provides that "coverage under this policy shall then [on exhaustion of required primary coverage] apply in conformance with and subject to the warranties, limitations, conditions, provisions, and other terms of the Primary Policy." Accordingly, Zurich contended that under the Prior Loss clause in the Federal primary policy, Zurich was not responsible for any losses incurred before July 1, 1998 because in neither year in which the Times-Picayune had excess coverage from Federal did Anzalone embezzle more than the $1,000,000 limit of the underlying primary policy.[2]  Second, in light of its conclusion that it had no liability under the Prior Loss clause, Zurich maintained that it was only bound to cover losses exceeding $1,000,000 incurred during the three-year life of its own excess policy (7/1/98 - 7/1/01).  The amount Anzalone embezzled during this three-year period was $1,165,873.  Zurich took the position that, once Federal's $1,000,000 in primary coverage was subtracted, its exposure under its $1,500,000 excess policy was actually only $165,873 out of the $1,205,879 in embezzlement losses that were not covered by (because in excess of the limits

_____

[2] The Times-Picayune did not carry excess insurance from January 1, 1995 to July 1, 1996.

5

of) the Federal primary policy.[3]  Zurich offered to settle for roughly this amount and in fact made a $93,064 payment to the Times-Picayune.

On September 19, 2002, the Times-Picayune filed a six-count complaint in Louisiana state court alleging, *inter alia*: (1) common law breach of the Zurich excess insurance policy contract; (2) breach of contract in bad faith; (3) a violation of LA. REV. STAT. ANN. § 22:1220, which requires the prompt adjustment of insurance claims in good faith; (4) a violation of LA. REV. STAT. ANN. § 22:658, which requires prompt payment of a claim on receipt of a satisfactory proof of loss; (5) a breach of the common law implied covenant of good faith and fair dealing; and (6) declaratory judgment.  Zurich removed the case to federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332.[4]

The district court granted partial summary judgment to Zurich, ruling as a matter of law that Zurich's excess policy unambiguously confined its liability only to those losses incurred during the three-year term of the Zurich policy that exceeded the $1,000,000 limit of the underlying Federal primary

---

[3] The Zurich policy has a $1,500 deductible but we ignore that to simplify the calculations.

[4] The parties consented to trial and disposition by the magistrate judge, so references to the district court refer to the magistrate judge.

policy. The district court subsequently entered a FED. R. CIV. P. 54(b) judgment as to count one of the complaint, concluding that, in light of the partial summary judgment order and a payment already made to the Times-Picayune, Zurich's remaining liability on count one was $60,000. The premise behind the Rule 54(b) judgment is that the Times-Picayune could not prevail on any of its five other causes of action without first having prevailed on its basic breach of contract claim.

The only issue the Times-Picayune raises on appeal is whether Zurich is responsible under its excess policy for all (or some part greater than awarded by the district court) of the $1,205,879 in embezzlement losses that were not covered by (because in excess of the policy limits of) Federal's July 1, 2000 - July 1, 2001 primary policy, or is only responsible for $165,873 of the $1,165,873 that was embezzled during the three-year term of Zurich's excess policy.

## Standard of Review

A grant of summary judgment is reviewed *de novo* under the same standard applied by the district court. *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, *9 (5th Cir. 2005). Where, as in the instant case, none of the material facts are in dispute, the court may enter judgment as a matter of law.

## Analysis

7

**1. The Language of the Excess Insurance Contract**

The parties do not dispute that Louisiana law controls.

> "Under Louisiana law, a court should interpret an insurance policy under ordinary principles for the interpretation of a contract. The intentions of the parties, as reflected by the words of the policy, should determine the extent of coverage. The words should be given their plain meanings, and the court should not change the coverage of the policy under the guise of interpreting ambiguous language. The court should consider the policy as a whole, and interpret the policy to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry. If a clause remains ambiguous after such consideration, then it should be construed against the insurer."

*Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 (5th Cir. 1990) (citations and footnotes omitted).

We begin, therefore, with the relevant provisions of the Zurich policy itself.

**a. The insuring clause of the Zurich policy provides:**

> "I.  INSURING CLAUSE.
> The Underwriter shall provide the Insureds with insurance coverage during the Policy Period excess of the Underlying Insurance. Coverage under this policy shall attach only after all of the Limit(s) of Liability of the Underlying Insurance has been exhausted by the actual payment of loss(es).  Except as otherwise provided herein, coverage under this policy shall then apply in conformance with and subject to the warranties, limitations, conditions, provisions, and other terms of the Primary Policy as in effect the first day of the Policy Period, together with the warranties and limitations

8

of any other Underlying Insurance.  In no event shall coverage under this policy be broader than coverage under any Underlying Insurance."

   b.   **The drop down clause (Clause IIIB) of the Zurich**

        **policy provides:**

"B.  REDUCTION/EXHAUSTION OF UNDERLYING LIMITS
In the event and only in the event of the reduction or exhaustion of the Limit(s) of Liability of the Underlying Insurance solely as the result of actual payment of loss covered thereunder, this policy shall: (i) in the event of reduction, pay excess of the reduced Limit(s) of Liability of the Underlying Insurance, and (ii) in the event of exhaustion, continue in force as primary insurance excess of the retention applicable in the Primary Policy, which retention shall be applied to any subsequent loss as specified in the Primary Policy.

Notwithstanding any of the terms of this policy which might be construed otherwise, this policy shall drop down only in the event of reduction of exhaustion of the Underlying Insurance by the actual payment of loss and shall not drop down for any other reason including, but not limited to, uncollectibility (in whole or in part) of any Underlying Insurance.  The risk of uncollectibility of such underlying Insurance (in whole or in part) whether because of financial impairment or insolvency of the underlying insurer or for any other reason, is expressly retained by the Insureds and is not in any way or under any circumstances insured or assumed by the Underwriter."

2.   **The Decision of the District Court**

In granting summary judgment to Zurich on the contract claim, the district court largely ignored the Zurich policy's

9

drop down clause, and focused instead on the Prior Loss clause of the Federal primary policy. It adopted this approach in reliance on *First Nat'l Bank of Amarillo v. Continental Cas. Co.*, 71 F.2d 838, 839 (5th Cir. 1934).

In *Amarillo*, the First National Bank of Amarillo, Texas, bought two insurance policies, called "bonds" in that case, from Continental on February 7, 1931. One Continental policy provided $50,000 in primary coverage and replaced a prior primary policy issued by another insurer for the same amount. The other Continental policy provided $50,000 in excess coverage. Unlike Continental's primary policy, the excess policy did not replace preexisting excess coverage from Continental or any other insurer. The excess policy had a rider stating that it would provide excess coverage for any loss sustained under the prior primary policy that was uncollectible because that policy had been terminated.

In April of 1932, First National Bank discovered that an employee had embezzled $78,000. The embezzler stole $46,000 before February 7, 1931 and $32,000 thereafter. In other words, neither before nor during the term of Continental's excess policy did the embezzler steal more than the $50,000 limit of the underlying primary policies.

The Continental primary policy had a rider attached to it that covered undetected prior losses as long as those losses

10

would have been covered by First National Bank's prior primary policy (issued by another insurer). Continental exhausted the $50,000 primary policy by paying $46,000 for the prior loss and $4,000 for the loss incurred during the term of its own primary policy. The First National Bank then sought to collect the remaining $28,000 from Continental under the $50,000 excess policy, but Continental refused to pay.

This court, over a vigorous dissent by Judge Hutcheson, sided with Continental. Though not citing any contractual language, the court began by concluding that the remaining $28,000 could not be collected under the excess policy itself because it provided only for future losses in excess of $50,000 and First National Bank only sustained a $32,000 loss after February 7, 1931. The court then turned to the rider attached to the excess policy. The court reasoned that this rider too could not be invoked because it referred specifically to losses that would have been recoverable under the prior primary policy and the amount embezzled during the life of that policy did not exceed $50,000.

It was irrelevant to the court that Continental's primary insurance had been exhausted by the payment of benefits for aggregate losses suffered during both the prior and current primary policies:

> "The primary bond became liable under the
> terms of its own rider for the loss of

11

> $46,000 sustained during the life of the prior bond. That bond and the prior canceled bond may not properly be treated as one and thereby make the excess bond liable for losses which it had not assumed. The excess bond assumed liability for losses above $50,000 incurred either before or after its effective date; but it did not contemplate or authorize the adding together or combining of losses incurred both before and after that date. To take future losses and add them to past losses and thus make up an amount sufficient to create a liability under the excess bond would be not to construe the contract by which the Casualty Company agreed to be bound, but to make one under which the bank could recover."

71 F.2d at 839.

The district court applied this reasoning to the Times-Picayune's claim, concluding that the Prior Loss provision of the Federal primary policy, as applicable under the language of the third sentence of the insuring clause of Zurich's excess policy, was never triggered because the embezzlement losses incurred during the two years of prior excess coverage amounted to only $503,578, well under the $1,000,000 limit of the Federal primary policies then in force.[5]  Finding that the primary policy's Prior Loss provision (as applicable in the Zurich excess policy under that policy's insuring clause) was never triggered, the district court ruled that Zurich was responsible only for prospective

---

[5] For the purposes of calculating the Times-Picayune's prior losses, the district court aggregated the losses sustained from July 1, 1996 to July 1, 1998, when the Zurich excess policy took effect.  In using this approach, the district court rejected Zurich's argument that its prior loss coverage would only be triggered if losses in any given year exceeded $1,000,000.

12

losses exceeding $1,000,000 that were incurred after the July 1, 1998 inception date of its excess policy. This resulted in liability to the Times-Picayune under the contract for $165,873 because the Times-Picayune suffered a $1,165,873 loss over the course of Zurich's three-year policy. Put differently, the district court ruled that Zurich's $1,500,000 excess policy was only responsible for $165,873 of the entire $1,205,879 that the Times-Picayune lost over and above the $1,000,000 limit of its primary policy with Federal. The district court, following *Amarillo*, ruled that it was irrelevant that the July 1, 2000 – July 1, 2001 primary policy had been exhausted by prior losses.

### 3. The Scope of Excess Coverage

#### a. *Amarillo* does not control

We begin with the conclusion that *Amarillo* is not controlling authority. *Amarillo* was decided in 1934, four years before the Supreme Court issued its landmark decision *Erie R.R. v. Thompkins*, 58 S. Ct. 817 (1938), in which the Court held that federal courts sitting in diversity should apply substantive state law and federal procedural law. *Amarillo* cites no court decision, treatise or other authority whatever in support of its conclusions, and the only reasonable inference is that the *Amarillo* panel was simply elucidating a federal common law of insurance contracts, a law that has long since ceased to apply to cases of this kind. Furthermore, *Amarillo* was on appeal from the

13

Northern District of Texas, not a federal court in Louisiana. In our view, it is inappropriate to treat such a pre-*Erie* Texas case, particularly one that went uncited between 1936 and the decision of the district court in this case, as controlling authority respecting an insurance contract dispute under Louisiana law.[6]

In addition, even if we were to consider *Amarillo*, it is distinguishable on its facts. First, unlike the instant case, there were no preexisting excess policies in *Amarillo*. Second, and more importantly, the Prior Loss provision was in the excess policy itself in *Amarillo* and it specifically referred to a loss that would have been collectible under the prior primary policy. In the instant case, on the other hand, the Prior Loss clause in the Federal primary policy, so far as applicable in Zurich's excess policy, *if* it can properly be read to *itself* limit the excess Zurich policy's coverage in ways it does *not* limit the primary policy's coverage, is most reasonably read, in light of all the provisions of Zurich's excess policy, as referring to Federal's prior excess policy, and, as will be discussed in some detail below, we conclude that Federal's prior excess coverage in this case would have covered the prior excess losses.

b. **The insuring and drop down clauses control**

---

[6] Until the district court resurrected it, *Amarillo* had only been cited by *National Surety Co. v. First Nat'l Bank*, 61 P.2d 1122 (Okla. 1936).

14

The district court discussed neither the insuring nor the drop down clauses of the Zurich policy in its partial summary judgment order. Instead, largely it seems in reliance on *Amarillo*, the district court started with the assumption that the Prior Loss clause exclusively controls because some of the embezzlement losses were incurred before the July 1, 1998 inception date of the Zurich policy. This assumption was error, however, because it prevented the district court from giving proper effect to the excess policy's insuring and drop down clauses. *Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 742 (5th Cir. 1998) ("'Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.' Contract provisions susceptible to different meanings should be interpreted 'to avoid neutralizing or ignoring any of them or treating them as surplusage,' and 'to preserve validity [of the contract].'" (quoting LA. CIV. CODE ANN. § 2050 and *Lambert v. Maryland Cas. Co.*, 418 So.2d 553, 559-60 (La. 1982))). When these clauses are properly understood in light of the excess policy as a whole, the scope of Zurich's liability clearly expands in favor of the Times-Picayune.

Zurich's excess insurance plainly covers prospective losses; losses, in other words, that were incurred from the July 1, 1998 inception date forward. With respect to the Times-Picayune's

prospective losses, there is no dispute that Anzalone stole $1,165,873 over the three-year period of Zurich's excess policy. We begin, therefore, with whether the district court was correct in ruling that Zurich's excess policy only covers $165,873 of this loss.

To answer this question, we turn to the plain language of the Zurich excess policy. Section one of the excess policy, titled the insuring clause, states in relevant part:

> "The Underwriter shall provide the Insureds with insurance coverage during the Policy Period Excess of the Underlying Insurance. Coverage under this policy shall attach only after all of the Limit(s) of Liability of the Underlying Insurance has been exhausted by the actual payment of loss(es)."

The most straightforward construction of this clause is that Zurich will pay for covered losses that the primary policy will not cover because it has been exhausted by the actual payment of benefits. This reading of the insuring clause is substantially reenforced by the unambiguous language of the drop down clause, which obligates Zurich "in the event of exhaustion, [to] continue in force as primary insurance excess of the retention applicable in the Primary Policy."[7] Under the wording of these two clauses,

---

[7] Zurich contends that the drop down clause has no application to this case because , by virtue of its sub-clause (ii), the provision of the drop down clause stating that the Zurich policy will drop down as primary coverage insurance in the event of exhaustion applies only to subsequent losses. The plain language of the sub-clause (ii), however, is clear that what applies in the event of subsequent losses is simply the retention applicable to the exhausted primary policy.

16

Zurich's duty to pay is triggered by a single condition: the exhaustion of the underlying primary policy by actual payment of benefits.

Neither the insuring clause nor the drop down clause, nor anything else in Zurich's policy, clearly conduces to Zurich's view, which was adopted by the district court, that liability attaches *only* after both of *two* distinct conditions are met: (1) exhaustion of the underlying primary insurance; *and* (2) in the event the first condition is met, Zurich is in any case only bound to cover that part of losses sustained during its policy period that exceed $1,000,000. While this second condition may be something *Amarillo* suggests, it is not what the policy itself, taken as a whole, provides. There is simply nothing in the plain language of the excess policy clearly stating that Zurich is *only* bound to pay for losses (exceeding $1,000,000) which were incurred during the period of its policy. To the extent that the district court and Zurich have developed a plausible alternative construction of the excess policy, all they have done is manufactured an ambiguity and it is elementary under Louisiana law that such ambiguities are construed in favor of coverage.

Between July 1, 1998 and the discovery of Anzalone's embezzlement in December of 2000, the Times-Picayune undisputedly lost $1,165,873. It is also undisputed that the Federal primary policy was entirely exhausted by the payment of actual losses to

17

the Times-Picayune for embezzlement losses covered under the primary policy that were incurred since the inception of the embezzlement scheme in 1995. Accordingly, under the plain and unambiguous language of the insuring and drop down clauses, Zurich is liable as primary insurer for the entire $1,165,873 that Anzalone embezzled between July 1, 1998, and July 1, 2001.

### c.   The prior loss

Having determined that Zurich is liable to the Times-Picayune for the entire $1,165,873 that was stolen during the term of Zurich's excess policy, we turn to a final detail. The $1,000,000 payment by Federal under its primary policy compensated the Times-Picayune for the first $1,000,000 of its total $2,205,879 embezzlement losses incurred from 1995 through 2000. Anzalone, however, stole $1,040,006 thereof between the beginning of his scheme in 1995 and the inception date of the Zurich excess policy on July 1, 1998. Because $40,006 more than $1,000,000 primary coverage was embezzled before the Zurich policy incepted on July 1, 1998, it was not included in the preceding analysis. The final question, therefore, is whether this outstanding $40,006 is also covered by Zurich's excess policy.

We begin with the Prior Loss clause because this $40,006 was embezzled prior to the inception of Zurich's excess policy on July 1, 1998. The Prior Loss clause imposes two distinct

18

conditions.  First, as stated in the introductory clause of the Prior Loss clause, the insured must have been "continuously insured" by a substantively identical policy, which the district court read to mean, for purposes of the Zurich policy, a substantively identical *excess* policy.  Second, as stated in clause "1." of the Prior Loss clause, "this insurance would have covered your loss had it been in effect at the time the acts that caused the loss occurred[.]" The district court construed "this insurance" to refer to the Zurich excess policy.  The district court construed the term "continuously" to mean that the only losses that counted for the purposes of the Prior Loss clause were losses that were incurred during a period of uninterrupted excess coverage.  Because the Times-Picayune did not have excess coverage between January 1, 1995, and July 1, 1996, the district court did not consider any of the $536,428 in embezzlement losses from that period as part of the losses that qualified under the Prior Loss clause.  The district court then ruled that the Prior Loss clause was not triggered because the aggregate losses in the two years immediately prior to the inception of the Zurich policy, years during which the Times-Picayune was covered by Federal excess policies, only added up to $503,578, well below the $1,000,000 limit of the Federal primary policy.

However, the district court did not opt for the simplest and most straightforward reading of Zurich's policy.  It is

19

undisputed that all of the Times-Picayune's $805,299 in embezzlement losses from January 1, 1995 until July 1, 1997 were within the coverage of the Federal primary policy. It is also undisputed that the Federal primary policy covered $194,701 of the Times-Picayune's losses from July 1, 1997, to July 1, 1998, when the Zurich policy began. What the Federal primary policy did not cover, however, was the additional $40,006 that Anzalone stole during this last year before the Zurich excess policy incepted on July 1, 1998. The Federal primary policy did not cover this $40,006 simply and only because the $1,000,000 policy limit had been reached by actual payment of losses. Thus the only loss to the Times-Picayune that is relevant for the purposes of the district court's reading of the Prior Loss clause as applied to the Zurich policy is this $40,006 that was embezzled sometime between July 1, 1997, and July 1, 1998.

Returning now to the language of the Prior Loss clause, it is undisputed that the Times-Picayune was continuously insured by an applicable excess policy from July 1, 1997 (indeed, from July 1, 1996), until the Zurich excess policy began on July 1, 1998. Thus the first condition of coverage (under the district court's reading of the Prior Loss clause as applied in the Zurich policy) is satisfied.

The second condition (again as construed by the district court's reading of the Prior Loss clause as applied in the Zurich

20

policy) is also satisfied because Zurich's excess coverage "would have covered [the Times-Picayune's $40,006] loss had it been in effect at the time the acts that caused the loss occurred," as stated in clause "1." of the Prior Loss clause. This is indisputable. Had the Times-Picayune discovered Anzalone's theft on June 5, 1998, and had Zurich's excess policy been in effect at that time, Zurich would have been liable for the $40,006 because the underlying Federal primary policy would have been exhausted by the actual payment of losses. Because Zurich would have been liable then, it is liable now. Any other construction of the Prior Loss clause would constitute impermissibly construing an ambiguity in favor of the insurer.

Finally, considering the Zurich policy as a whole, we cannot accept the district court's reading of the third sentence of its insuring clause.[8] The sentence in question plainly intends to of itself exclude from the excess policy coverage of any loss *excluded* from (or not covered by or otherwise not recoverable under) the primary policy, whether or not *otherwise* excluded by the *excess* policy itself. But we cannot read that sentence as

---

[8] That sentence states
"Except as otherwise provided herein, coverage under this policy shall apply in conformance with and subject to the warranties, limitations, conditions, provisions, and other terms of the Primary Policy as in effect the first day of the Policy Period, together with the warranties and limitations of any other Underlying Insurance."

21

unambiguously *of itself independently* imposing a limitation on coverage under the excess policy so as to exclude from the excess policy coverage of losses that *are* within the coverage of and are *not* excluded by or otherwise not recoverable under the underlying primary policy.  The excess policy has no Prior Loss clause, and it contains no provision excluding prior losses or limiting coverage to losses incurred after the effective date of the policy.  The underlying primary policies each do have a Prior Loss clause, and it *does provide* coverage under those policies (subject to certain conditions, which are indisputably satisfied respecting the Federal primary policy in effect from July 1, 2000, to July 1, 2001, as to the entire $2,205,879 loss).  To the extent there is ambiguity in this respect it must be resolved against Zurich.  For this reason also, the Prior Loss clause of the primary policy does not support the district court's judgment.

## Conclusion

For the foregoing reasons, the judgment of the district court is REVERSED and this case is REMANDED to the district court for further proceedings not inconsistent with this opinion.

REVERSED and REMANDED

22