**BRIGHAM YOUNG UNIVERSITY, a Utah corporation, Plaintiff–Appellant,**

**v.**

**LUMBERMENS MUTUAL CASUALTY COMPANY, an Illinois corporation, Defendant–Appellee.**

**No. 90–4118.**

United States Court of Appeals, Tenth Circuit.

May 22, 1992.

established that the employee acted or failed to act due to fraud or malice.

John A. Adams, Ray, Quinney & Nebeker (Stephen B. Nebeker and James S. Jardine, with him, on the briefs), Salt Lake City, Utah, for plaintiff-appellant.

Joseph J. Joyce, Strong & Hanni (R. Scott Williams, with him, on the brief), Salt Lake City, Utah, for defendant-appellee.

Before HOLLOWAY and SETH, Circuit Judges, and DUMBAULD, District Judge *.

SETH, Circuit Judge.

Brigham Young University filed suit seeking declaratory relief under a fidelity policy from Lumbermens Mutual Casualty Company (Lumbermens) for losses the University had suffered. These had taken place over ten or twelve years. This included a period of time before the Lumbermens policy became effective. The losses were from the school's art collection and had gone undiscovered for years.

The parties filed cross motions for summary judgment. The trial court granted the motion of Lumbermens and entered judgment to deny relief to BYU. It held that the provision of the policy entitled "General Agreement C" determined the extent of coverage, and not "Section 10" as asserted by BYU. The court also decided that BYU could not recover under the policy for expenditures made seeking to recover the losses.

Sometime before September 19, 1968, the University hired a full-time professor of art. Part of his responsibilities were the University's art collection which had become substantial. During his tenure at the University, he committed fraudulent or dishonest acts that resulted in the loss of over 300 works of art from the University. The losses occurred during periods when the art collection, hereinafter described, had been covered by policies written by several companies, including Lumbermens.

The basic issue on this appeal is the extent of the coverage provided by the surety policy written by Lumbermens for BYU effective in 1982 to replace previous policies written by others. More particularly concerned is the coverage for losses to BYU which took place before the effective date of Lumbermens' policy.

Fidelity policies or bonds of the type here concerned are unusual in that limited coverage is provided for losses which took place under previous policies which had expired before the effective date of the current policy; provided, among other limitations, that such losses were *not* discovered until the current policy had become effective. Policy provisions which so extend coverage are described as "retroactive extension" or "superseded suretyship" clauses.

In this appeal the "discovery period" for losses had expired under the three prior policies, but not for the current Lumbermens policy. Also all prior coverage had been written by companies not affiliated or connected with Lumbermens.

It was agreed that the losses were not discovered until the period of the current policy, and that there were no time gaps in the previous coverage as the policies changed. Also there is no question but that the discovery period under all prior bonds had expired.

The data as to the various policies is as follows:

| Insurance Company | Limit of Liability | Deductible | Period of Coverage |
|---|---|---|---|
| Lumbermens Mutual Casualty Co. | $1,000,000 | $ 2,500 | 12/1/82 to present |
| Federal Ins. Co. ("Federal") | $1,000,000 | $ 2,500 | 12/1/78 to 12/1/82 |
| Fidelity Deposit Co. of Md. ("Fidelity") | $ 500,000 | $50,000 | 11/1/75 to 12/1/78 |
| Western Casualty & Surety Co. ("Western") | $ 50,000 | 0 | 9/19/68 to 11/1/75 |

(taken from page 2 of the trial court's order)

The University timely notified Lumbermens of the losses and timely filed a proof of loss. The parties agree that the missing art had a combined appraised value of $864,350 and that the art taken during the Lumbermens policy period has an appraised value of $9,250. The precise dates upon which some of the works of art were taken is unknown. In computing its liability to the University Lumbermens placed all of the works with unknown missing dates in the Western policy period.

The assignment of losses to particular policies has not become an issue. BYU takes the position that Lumbermens is liable to the face amount of its policy for all the losses regardless of dates by reason of certain provisions in the policy, and apparently no allocation is required.

Lumbermens computes its liability as follows:

| Insurance Company | Limit of Liability | Deductible | Value of Missing Art | Amount Paid |
|---|---|---|---|---|
| Lumbermens | $1,000,000 | $ 2,500 | $ 9,250 | $ 6,750 |
| Federal | $1,000,000 | $ 2,500 | $ 17,200 | $ 14,700 |
| Fidelity | $ 500,000 | $50,000 | $116,038 | $ 66,038 |
| Western | $ 50,000 | 0 | $721,862 | $ 50,000 |
| TOTALS | | | $864,350 | $137,488 |

(taken from the trial court's order)

The University computes its total claim as follows:

| | |
|---|---|
| $ 864,350.00 | value of missing works of art |
| 148,320.14 | recovery costs |
| $1,012,670.14 | amount owed to University |
| (12,670.14) | less amount in excess of policy limit |
| (2,500.00) | less deductible under Lumbermens bond |
| (137,488.00) | less amount already paid by Lumbermens |
| $ 860,012.00 | University's total claim |

Lumbermens asserts that it has paid the $137,488 described above and this is the extent of its liability. In computing this figure (as the table indicates) Lumbermens adds the amounts due for losses under previous policies by an application of the face amounts of the policies prior to its

own less the policy deductibles. This also represents Lumbermens' allocation of losses to each time period. As the trial court indicates, Lumbermens in reaching such a result relies on *Traders State Bank v. Continental Ins. Co.*, 448 F.2d 280 (10th Cir.1971).

Thus the dispute in this case centers around which of two policy provisions governs the loss of art discovered during the Lumbermens policy period but stolen before the effective date of that policy. Lumbermens contends, as the trial court decided, that the controlling policy provision is General Agreement C, which provides:

"**C. Loss Under Prior Bond or Policy.** *If the coverage of this Bond is substituted for any prior bond or policy of insurance carried by the Insured or by any predecessor in interest of the Insured,* which prior bond or policy is terminated, canceled or allowed to expire as of the time of such substitution, *the Underwriter agrees that this Bond applies to loss which is discovered as provided in Section 1 of the Conditions and Limitations* and which would have been recoverable by the Insured or such predecessor under such prior bond or policy except for the fact that the time within which to discover loss thereunder had expired; provided:

"(1) the indemnity afforded by this General Agreement C shall be a part of and not in addition to the amount of insurance afforded by this Bond;

"(2) such loss would have been covered under this Bond had this Bond with its agreements, limitations and conditions as of the time of such substitution been in force when the acts or defaults causing such loss were committed; and

"(3) *recovery under this Bond on account of such loss shall in no event exceed the amount which would have been recoverable under this Bond* in the amount for which it is written as of the time of such substitution, had this Bond been in force when such acts or defaults were committed [i.e. $1,000,000], *or the amount which would have been recoverable under such prior bond or policy had such prior bond or policy contin-*

*ued in force until the discovery of such loss, if the latter amount be smaller.*"

(Emphasis added.)

The University, however, relies on Section 10 of the Conditions and Limitations, which provides:

"**Section 10. Limit of Liability under this Bond and Prior Insurance.** With respect to loss caused by any Employee or in which such Employee is concerned or implicated or which is chargeable to any Employee as provided in Section 4 and *which occurs partly during the Bond Period and partly during the period of other bonds or policies issued by the Underwriters* to the Insured or to any predecessor in interest of the Insured and terminated or canceled or allowed to expire *and in which the period for discovery has not expired at the time any such loss thereunder is discovered,* the total liability of the Underwriter under this Bond and under such other bonds or policies shall not exceed, in the aggregate, the amount stated in Item 3 of the Declarations [i.e. $1,000,000] or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss, if the latter amount be the larger."

(Emphasis added.)

The University contends that the district court erred in holding that Section 10 does not apply to its loss.

"We review the grant or denial of summary judgment de novo. We apply the same legal standard used by the district court under Fed.R.Civ.P. 56(c)...."

*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). This is a diversity case and the law of Utah, the forum state, is to be applied.

Under the University's view, Section 10 covers the loss because the University reads Section 10 to govern losses that occur partly during Lumbermens' bond period and partly during the prior bond periods, whoever may have written such bonds. According to the University, Section 10

mandates that the coverage amount of Lumbermens' present bond applies to all losses. It should thus receive the aggregate loss, up to $1,000,000, or the amount available to it under the prior bonds, as limited by their terms and conditions, whichever is larger. In this case, the aggregate loss claimed by the University is $864,350 while the loss as limited by the terms and conditions of the prior bonds is much less. Thus, the University claims that Section 10 entitles it to receive $864,-350 from Lumbermens.

Additionally, the University asserts that General Agreement C does not apply because that section of the bond only covers losses that occur entirely during prior bond periods. In this case some of the losses occurred during prior bond periods and some during the Lumbermens bond period.

Lumbermens acknowledges that losses from prior bond periods are partially covered by the present bond, but it contends that losses from the prior periods are covered under General Agreement C rather than Section 10. Lumbermens argues that Section 10 does not apply because, as the term "Underwriters" therein used indicates, Section 10 only applies to bonds that were written by Lumbermens or other members of the Kemper Group. Thus "Underwriters" means only companies related to Lumbermens, the "Underwriter."

Lumbermens also asserts that because the time for discovery of loss has expired under the prior policies the University cannot bring a claim under Section 10. Lumbermens relies on the phrase "and in which the period for discovery has not expired at the time any such loss thereunder is discovered" in Section 10 to bar recovery by the University under that section. The University responds that the discovery clause in Section 10 refers to the discovery period under the Lumbermens bond and that this discovery period has not yet expired.

In construing a contract, a court must attempt to give effect to the intentions of the parties "by looking at the entire contract and all of its parts in relation to each other, giving an objective and reasonable construction to the contract as a whole."

*Sears v. Riemersma*, 655 P.2d 1105, 1108 (Utah 1982); *see also Buehner Block Co. v. UWC Assoc.*, 752 P.2d 892, 895 (Utah 1988). Accordingly, "a construction which neutralizes any provision of a contract should never be adopted if the contract can be so construed as to give effect to all the provisions." 13 John A. Appleman & Jean Appleman, *Insurance Law and Practice*, § 7383 at 34–37. *See also, LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988).

■ After carefully reviewing the policy as a whole, we agree with the district court that the interpretation of Section 10 urged by the University cannot be adopted.

The language of General Agreement C must govern. It provides that Lumbermens will cover certain losses sustained during prior policy periods that are discovered during Lumbermens' policy period. General Agreement C limits Lumbermens' obligation under prior bonds to the "amount which would have been recoverable under such prior bond or policy had such prior bond or policy continued in force until the discovery of such loss, if the latter amount be smaller;" that is, "smaller" than the face amount of the current policy. This limits the recovery to the amount shown in the chart above as computed by Lumbermens.

Section 10 as interpreted by the University, in subjecting Lumbermens to liability on the prior bonds, would subject it to liability in excess of the coverage in the prior bonds. Thus the limit of liability under the Western bond is $50,000. Under the University's interpretation, the ceiling on Lumbermens' liability for losses during Western's bond period is not the limit of the Western bond ($50,000) but the current bond limit of $1,000,000. This is inconsistent with the clear intent of General Agreement C.

Additionally, the University challenges the district court's finding that the discovery period limitation in Section 10 refers to prior policies and not the current Lumbermens policy. As the district court noted in its Memorandum and Order (page 11):

"BYU's contention that the discovery period limitation refers to Lumbermens policy disregards the fact that Conditions and Limitations Section 1 already makes clear that *all* claims must occur within the discovery period of the Lumbermens policy, *except for the extension provided in General Agreement C.* In other words, BYU's interpretation of Section 10's discovery period limitation has the effect of rendering this condition of Section 10 meaningless inasmuch as Section 1 already places such a condition on all claims."

Thus, the interpretation urged by the University creates inconsistencies among the provisions of the contract rather than harmonizing them. "[I]t is axiomatic that a contract should be interpreted so as to harmonize all of its provisions and all of its terms, which terms should be given effect if it is possible to do so." *LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988).

Given the clarity of General Agreement C it is unreasonable to believe that the drafter of the policy would include superseded suretyship coverage in another section of the policy, namely Section 10, and that the second provision would then contradict the language of a prior section. The University's interpretation of Section 10 cannot be applied. Therefore, General Agreement C controls the amount that Lumbermens owes the University as a result of losses under prior policies.

■ The University also argues that Section 10 is ambiguous and therefore must be interpreted against Lumbermens. The University claims that because it disagrees with Lumbermens over Section 10's application an ambiguity exists which must be resolved in its favor. The Utah courts have stated that ambiguities are to be resolved in favor of the insured. *Fuller v. Director of Fin.*, 694 P.2d 1045, 1046 (Utah 1985). In this case, however, there is no ambiguity. The Utah Court of Appeals defined an ambiguity in *Crowther v. Carter*, 767 P.2d 129 (Utah App.1989), by saying:

"Contract language is considered ambiguous if the words used to express the meaning and intention of the parties are 'insufficient in a sense that the contract may be understood to reach two or more plausible meanings.'"

*Id.* at 131 (citation omitted).

The contract at hand is not open to more than one plausible meaning. As we stated above, the interpretation advanced by the University creates contradictions. That interpretation, therefore, cannot be "plausible" under *Crowther.* Thus, the contract is not ambiguous.

■ The University's second point on appeal is that the district court erred in holding that Rider No. 2 to the Lumbermens bond does not entitle it to receive reimbursement for $148,320.14 expended in efforts to recover the missing art. These recovery costs sought to be recovered exceed the value of the art recovered. Lumbermens did not deduct from its payment the value of the 45 missing items recovered.

The University contends that the wording of Rider No. 2 allows for reimbursement. Rider No. 2 (paragraph 1) states in part:

"1. The Underwriter shall not be liable under the attached bond on account of [a fidelity] loss ... unless the amount of such loss, *after deducting the net amount of all reimbursement and recovery,* including any cash deposit taken by the Insured, obtained or made by the Insured, other than from any bond or policy of insurance issued by a surety or insurance company and covering such loss, or by the Underwriter on account thereof prior to payment of the Underwriter of such loss, shall exceed in the aggregate the sum of Two Thousand Five Hundred Dollars ($2,500) (herein called the Deductible Amount) and then for such excess only, but in no event for more that the amount of indemnity carried under the attached bond on such loss."

(Emphasis added.) Printed at the bottom of the rider in small capital letters is the following statement: "DEDUCTIBLE RID-

ER. FOR USE WITH COMMERCIAL BLANKET BONDS WHEN ISSUED AS EXCESS OVER AN AMOUNT."

The University's claim for reimbursement is based on its interpretation of the phrase in paragraph 1 of Rider No. 2 which states that the amount of loss is established "after deducting the net amount of all reimbursement recovery." The University reads this phrase to allow reimbursement of its recovery costs even if the recovery costs are greater than the value of the art recovered. To come to this conclusion, the University argues that the ordinary meaning of "net amount" is broad enough to encompass a negative number. We disagree as did the trial court.

The term "net amount" is not defined anywhere in the Lumbermens bond and the parties have presented no cases which assist us with the definition of the term. Therefore, we must look to the plain meaning of the words. *See Government Employees Ins. Co. v. Dennis,* 645 P.2d 672, 675 (Utah 1982). Webster's Third International Dictionary (Unabridged) defines "net" as, "remaining after the deduction of all charges, outlay, or loss." Thus, the plain import of the words "net amount" is that something must remain. Webster's defines "remain" as, "to be a part not destroyed, taken away, or used up: be still extant, present, or available: *be left when the rest is gone."* (Emphasis added.) If recovery costs exceed the value of the recovered art there can be no remainder. As the trial court stated in its order at page 12: "It is the court's view that only a net positive amount could come into play as a *deduction* under the plain meaning of paragraph 1 of Rider No. 2." (Emphasis added.) Therefore, the district court did not err when it found that "net amount" as that term is used in the policy referred to net *positive* amounts.

Accordingly, the order of the District Court for the District of Utah granting Lumbermens' motion for summary judgment is in all respects AFFIRMED.

Judge Dumbauld heard the oral argument in this appeal but became ill after the hearing. We appreciated his help and had hoped that he could participate in this opinion. Filing was withheld with that expectation. However, he has been unable to do so. He may wish to file a separate opinion.

Since filing the opinion in this case, Judge Dumbauld has fully concurred.

