No. 05-579

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 344

FRONTLINE PROCESSING CORP.,

      Plaintiff,

   v.

AMERICAN ECONOMY INSURANCE CO.,

      Defendant.

ORIGINAL PROCEEDING:     Certified Question, United States District Court
                                 District of Montana, Butte Division
                                 The Hon. Sam E. Haddon, Presiding Judge

COUNSEL OF RECORD:

      For Plaintiff:

           Herbert I. Pierce, III, Jeffrey J. Oven, Bryan P. Wilson, Crowley,
           Haughey, Hanson, Toole & Dietrich, PLLP, Billings, Montana

      For Defendant:

           Carey E. Matovich, Brooke B. Murphy, Matovich & Keller, P.C.,
           Billings, Montana

      For Amicus Curiae:

           Lawrence A. Anderson, Montana Trial Lawyers Association,
           Great Falls, Montana

Submitted on Briefs:  June 1, 2006

Decided:  December 27, 2006

Filed:

_____
                    Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 In April 2003, plaintiff Frontline Processing Corporation (Frontline), a credit card processing company, brought this action in the United States District Court for the District of Montana for breach of contract and violation of Montana's Unfair Trade Practices Act. Defendant American Economy Insurance Company (American Economy) moved for partial summary judgment based in part on its argument that the definition of the term "direct loss" in the insurance contract at issue precluded Frontline from recovering many of the damages that it claims are covered and payable under the policy. The District Court denied summary judgment in July 2005, on the basis that there was no clear Montana precedent.

¶2 By order dated September 27, 2005, and pursuant to M. R. App. P. 44, the United States District Court for the District of Montana, Great Falls Division, certified the following question to this Court:

> Does the term "direct loss" when used in the context of employee dishonesty coverage afforded under a businessowner's liability policy, include consequential damages that were proximately caused by the alleged dishonesty, or is the construction of the term "direct loss" limited to those damages that directly result from the alleged employee dishonesty?

¶3 We accepted the question in our order dated October 12, 2005, and for the reasons set forth below, we conclude that the term "direct loss" when used in the context of employee dishonesty coverage afforded under a business owner's liability policy, means all losses proximately caused by an employee's dishonesty.

# BACKGROUND

¶4 In accordance with M. R. App. P. 44, the United States District Court certified the facts set forth below in paragraphs 5-17.

¶5 Frontline is a credit card processing company based in Bozeman, Montana. Chris Kittler is the owner and president of Frontline.

¶6 Ron Reavis was employed as Frontline's Chief Financial Officer until February 2001.

¶7 Frontline purchased a special Businessowner's Policy (Policy) from American Economy in August 1999. At that time, Frontline also purchased $250,000.00 in optional coverage for employee dishonesty.

¶8 During his employment at Frontline, Reavis was allegedly responsible for filing Frontline's payroll taxes, corporate income taxes, and Kittler's personal income taxes.

¶9 Frontline claims that while employed at Frontline, Reavis engaged in dishonest acts such as forging Kittler's signature on Frontline checks, using the company credit card for his own purposes, and deliberately failing to file Frontline's payroll taxes and corporate income taxes.

¶10 As a result of the alleged dishonest acts of Reavis, Frontline retained Heartland Business Intelligence (Heartland) to conduct a forensic examination of Reavis's computer activities to determine the degree and extent of Reavis's alleged theft. Frontline claims Heartland's fees in the amount of $24,050.20 are covered under the Policy.

¶11 Frontline similarly retained Karen S. Runyon (Runyon) to perform a forensic handwriting analysis of certain Frontline checks to determine which ones, if any, Reavis forged. Frontline claims that the $3,812.50 fee for Runyon's analysis is also covered under the Policy.

¶12 Frontline also retained Galusha, Higgins & Galusha (Galusha) to investigate, evaluate, and rectify the financial situation that Reavis allegedly had caused. It claims that Galusha's fees in the amount of $57,654.81 are covered by the Policy.

¶13 Frontline also seeks coverage costs, interest, penalties, and fees assessed by the Internal Revenue Service (IRS) as a result of Reavis's alleged deliberate failure to pay Frontline's and Kittler's taxes.

¶14 The "employee dishonesty" coverage afforded by the Policy provides as follows:

   A.          Employee Dishonesty

      i. We [American Economy] will pay for **direct loss** of or damage to Business Personal Property and "money" and "securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

         1. Cause you to sustain loss or damages; and also

         2. Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

            a. Any employee; or

            b. Any other person or organization.

(Emphasis added by the U. S. District Court.)

4

¶15 American Economy maintains that the costs, fees, interest and penalties assessed by the IRS, as well as the fees paid to Heartland, Runyon, and Galusha, are not "direct losses" within the meaning of the phrase, and are therefore not covered losses under the Policy.

¶16 Frontline maintains that the Policy does afford coverage for costs, fees, interest and penalties assessed by the IRS, as well as fees paid to Heartland, Runyon, and Galusha because Frontline alleges these losses were proximately caused by Reavis's dishonest conduct.[1]

¶17 For purposes of this certified question only, American Economy concedes that Reavis had "manifest intent" as defined in the Policy.

¶18 Based on these facts, the federal court certified the question to this Court. Under M. R. App. P. 44(c), this Court may answer a question of law certified to it by another qualifying court. Therefore, our review is purely an interpretation of the law as applied to the agreed facts underlying the question. *Rich v. State Farm Mut. Auto. Ins. Co.*, 2003 MT 51, ¶ 11, 314 Mont. 338, ¶ 11, 66 P.3d 274, ¶ 11.

## DISCUSSION

¶19 Frontline argues, among other things, that several jurisdictions have interpreted "direct loss" to mean all losses proximately caused by an employee's dishonest activity. *See*, e.g., *Jefferson Bank v. Progressive Cas. Ins. Co.*, 965 F.2d 1274, 1281 (3rd Cir. 1992); *Auto Lenders v. Gentilini Ford.*, 854 A.2d 378, 386-87 (N.J. 2004); *Mid-*

---

[1] For purposes of this certified question only, American Economy admits these losses were occasioned by Reavis's alleged dishonesty.

5

*America Bank of Chaska v. American Cas. Co.*, 745 F. Supp 1480, 1485 (D. Minn. 1990). It maintains that the disputed claimed expenses were losses proximately caused by Reavis's actions. Frontline further avers that incurrence of the disputed claimed expenses was mandated by the policy's investigation and mitigation of damages provisions.

¶20 American Economy counters that the losses Frontline is claiming are consequential, not *direct* losses, and therefore are not covered by the policy. It relies on cases from jurisdictions that have expressly declined to apply a proximate cause analysis to the term "direct loss," holding instead that a narrower standard was appropriate. *See*, e.g., *Tri City Nat. Bank v. Federal Ins. Co.*, 674 N.W.2d 617, 625 (Wis. App. 2003); *RBC Mortg. Co. v. National Union Fire Ins. Co.*, 812 N.E.2d 728, 733 (Ill. App. 1st Dist. 2004). American Economy further maintains that the disputed claims represent monies that Frontline owes to third parties, thus making them third party liabilities and not direct losses. Relying on *Vons Companies, Inc. v. Federal Ins. Co.*, 212 F.3d 489 (9th Cir. 2000), and numerous other cases from the First, Fifth, Sixth and Seventh Circuits, American Economy urges us to adopt the Ninth Circuit's rule that "direct means direct" and that in the absence of a third party claim clause, a policy covering "direct losses" does not provide indemnity for vicarious liability for tortious acts of a dishonest employee. Additionally, the insurer argues that the policy did *not* require Frontline to incur the expenses it is claiming.

¶21 As noted above, the policy before us insures Frontline against direct losses caused by the dishonesty of its employees. Many jurisdictions have construed "direct

6

loss" or similar language in a fidelity bond or insurance policy. A fidelity policy, also known as an employee dishonesty policy, is a form of insurance in which the insurer agrees "to indemnify an employer against a loss arising from the lack of integrity or honesty of an employee . . . ." Black's Law Dictionary 804 (Bryan A. Garner, ed., 7th ed., West 1999). Under a liability policy, by contrast, the policy holder is insured against or indemnified for, vicarious liability to a third party claimant. *RBC*, 812 N.E.2d at 733. The policy before us is clearly the former—i.e., it is an employee dishonesty, or fidelity, policy. See ¶ 7.

¶22 The claims asserted by Frontline are for business expenses and losses it incurred as a result of its employee's dishonesty. While American Economy equates the claims for which Frontline seeks recovery—those of the analysts, the accountants and the IRS—with the classic third party claims for which there would typically be no coverage under a fidelity policy, Frontline maintains that these are losses proximately caused by the employee's dishonest conduct which the policy was intended to cover. We turn to the cases cited by the parties for guidance in answering this question.

¶23 In *Vons*, upon which American Economy relies, Vons was insured for employee dishonesty by Federal Insurance Company. The policy coverage was limited to Vons' direct losses incurred as a result of employee misconduct. An employee of Vons engaged in a dishonest act which resulted in Vons being sued by defrauded third parties. Vons settled these third party claims, and then submitted a proof of loss to recover the amount it paid in the settlement. Vons argued the loss from the settlement of the liability suit was a "direct loss" incurred due to the actions of the employee.

7

*Vons*, 212 F.3d at 490-91. The Ninth Circuit rejected this argument, finding that coverage did not extend to Vons' liability settlement of third party claims for losses arising out of the tortious conduct of its employees. *Vons*, 212 F.3d at 492. The federal court continued that "direct means direct" and the third party claims were not direct. *Vons*, 212 F.3d at 492.

¶24 Similarly, in *Tri City Nat. Bank,* employees of a branch of the Tri City Bank participated in a scheme to obtain fraudulent mortgage loans for insufficiently funded borrowers. Ultimately, these borrowers defaulted on the fraudulently-obtained loans, the scheme was discovered, and the mortgage companies sued Tri City to recover their losses. Tri City sought confirmation from Federal Insurance Company (Federal) that the fidelity bond in place covered Tri City for either judgments or settlements paid to the mortgage companies resulting from the fraud. Federal denied coverage on the ground that the bond covered only those losses "resulting directly from dishonest or fraudulent acts" of Tri City employees. Tri City settled the claims brought by the mortgage companies and then sought indemnity from Federal for the settlement amounts. Federal again denied coverage. *Tri City*, 674 N.W.2d at 617-20.

¶25 The Wisconsin Court of Appeals noted that Tri City's claimed losses arose from settlements with third parties and were not the direct result of its employees' dishonesty; in fact Tri City's liability to the mortgage companies did not come into being until nearly three years after the fraudulent conduct occurred. *Tri City*, 674 N.W.2d at 623. See also *Aetna Cas. & Sur. Co. v. Kidder, Peabody*, 676 N.Y.S.2d 559, 246 A.D.2d 202 (N.Y. A.D. 1 Dept. 1998) (If an employee's dishonesty causes losses to

8

a third party, which then leads to litigation concluding in a judgment or settlement, the insured has not incurred a "direct loss" under a fidelity bond; the insured's loss is "indirect."); *RBC*; and *Finkle v. St. Paul Fire and Marine Ins. Co*., 2002 WL 1359672 (D. Conn.) (not reported in F. Supp.2d).

¶26    Here, unlike in the cases above, Frontline's disputed claims are not the result of lawsuits by or settlements made to third parties.  Rather, as argued by Frontline, they arise from costs incurred to investigate the extent of Reavis's alleged dishonest conduct and to mitigate and remedy the discovered damage.  In making this argument, Frontline relies in part upon three cases from the Third Circuit Court of Appeals—*Jefferson Bank v. Progressive Casualty Ins. Co*., 965 F.2d 1274 (1992); *Resolution Trust Corp. v. Fidelity & Deposit Co.*, 205 F.3d 615 (2000), and *Scirex Corp. v. Federal Ins. Co*., 313 F.3d 841 (2002).  In these cases, the courts employ a "proximate cause" standard in determining whether the claim presented by the insured is or is not the type of "direct loss" covered by the policy.

¶27    In *Jefferson Bank*, plaintiff Jefferson Bank sought indemnification for direct losses resulting from a loan created with the aid of an imposter notary, who affixed her invalid notarization to the mortgage, and then failed to record it.  The customer subsequently placed other mortgages on the same property, at least one of which was recorded, and when the customer defaulted on all loans, Jefferson Bank was unable to take possession of the property.  *Jefferson Bank*, 965 F.2d at 1275-76.  Progressive, the defendant insurer, argued that the Bank's loss was not covered under the bond's coverage for losses "resulting directly from" fraudulent signatures, because the loss was

not caused by the notary's forged signature, but rather by the fact that the building was so heavily encumbered. *Jefferson Bank*, 965 F.2d at 1280-81. The Third Circuit held that under Pennsylvania law, the "direct cause of a loss" does not have to be the "sole" or "immediate" cause, but need only be a proximate or substantial cause. The Federal Court opined that:

> "[D]irect cause" or "immediate cause" is a nebulous and largely indeterminate concept, and one that does not enjoy favor under Pennsylvania law. As we have suggested, Pennsylvania, consistent with general notions of proximate causation, requires that plaintiffs in negligence cases show substantiality, rather than immediacy, in order to demonstrate proximate cause.

*Jefferson Bank*, 965 F.2d at 1281.

¶28    Also, in *Scirex*, the Third Circuit applied the proximate cause standard, relying on *Jefferson*, stating, "Pennsylvania law equates 'direct cause' with 'proximate cause.'" *Scirex*, 313 F.3d at 843-44. In *Scirex*, nurse employees for the insured, Scirex (a pharmaceutical-testing company), failed to follow protocol and engaged in deceptive record keeping, both of which rendered certain drug studies worthless. As a result, Scirex was unable to procure and produce results for its contracted sponsor, and Scirex was forced to replicate the studies using $1.2 million of its own funds. Scirex sought indemnity for the replication costs from its insurer, Federal, under a blanket employee dishonesty policy. Federal denied the claim, prompting Scirex to sue Federal for the losses. The federal district court held that "Scirex's losses were directly tied to these studies, and by rendering those studies worthless, the nurses' behavior proximately, and therefore directly, caused Scirex's losses." *Scirex*, 313 F.3d at 843-45, 850.

10

¶29    In 2004, the New Jersey Supreme Court was asked to consider whether the use of a proximate cause test for evaluating the nature of a loss was appropriate under an employee dishonesty policy that requires a direct loss. *Auto Lenders*, 854 A.2d 378. The New Jersey Court noted that "the majority of federal courts that have addressed this question have concluded that the term 'direct loss' or its equivalent does, in fact, call for the application of a proximate-causation standard." *Auto Lenders*, 854 A.2d 386. Citing *Scirex* (applying proximate cause test to "direct loss"), *F.D.I.C. v. National Union Fire Ins. Co.*, 205 F.3d 66, 76 (2d Cir. 2000) (applying proximate cause test to policy language covering "loss resulting directly from" employee dishonesty), *Resolution Trust Corp.*, *Jefferson Bank,* and *First Nat. Bank of Louisville v. Lustig*, 961 F.2d 1162, 1167-68 (5th Cir. 1992), the New Jersey Court adopted "the conventional proximate cause test as the correct standard to apply when determining whether a loss resulted from the dishonest acts of an employee."  It stated, "[o]ur interpretation comports with our general principles of insurance law, including our practice of interpreting coverage provisions broadly. . . .   There being no sound reason why a proximate-cause analysis should not be employed when determining whether a loss is direct under a fidelity insurance policy, we will apply that approach to such policies, including the policy at issue in this appeal." *Auto Lenders*, 854 A.2d at 387.

¶30    We are persuaded that a proximate cause analysis is appropriate in determining whether a loss is "direct" under a fidelity insurance policy.  Such a position comports, as well, with our tradition of applying a causation standard to various types of losses claimed under insurance policies.  *See*, e.g., *Green v. Milwaukee Mechanics' Ins. Co.*,

11

77 Mont. 505, 252 P. 310 (1926) (Insurer of a fire insurance policy containing an "explosion" exemption, is liable for both the fire and explosion damage where the explosion is caused by a pre-existing fire "since the fire is the proximate cause of the whole loss and the explosion is a mere incident."); *Newman v. Kamp*, 140 Mont. 487, 493-94, 374 P.2d 100, 104 (1962) (For claimant to prevail in industrial accident claim, he must establish by a preponderance of evidence that such injury was the proximate cause of his present condition.); *Life Ins. Co. of North America v. Evans*, 195 Mont. 242, 247, 637 P.2d 806, 808 (1981) (In a negligence action, where an accidental injury aggravates or triggers a pre-existing dormant disease or physical infirmity, the accident may be said to have been the proximate cause of the resulting disability within the terms and meaning of an ordinary accident insurance policy.).

¶31 For the foregoing reasons, we answer the certified question by concluding that the term "direct loss" when used in the context of employee dishonesty coverage afforded under a business owner's liability policy, applies to consequential damages incurred by the insured that were proximately caused by the alleged dishonesty. We do not address or resolve the question of whether all of the claims presented by Frontline for payment under the policy were proximately caused by the dishonest actions of Reavis, as this is beyond the scope of the certified question.

¶32 Question answered.


/S/ PATRICIA COTTER


12

We Concur:

/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ JOHN WARNER
/S/ JIM RICE