DeVORE, J.
*166 This appeal arises out of an insurance claim by Summit Real Estate Management, LLC, (Summit) for losses resulting from eight years of embezzlement by its longtime bookkeeper. Summit was insured during that period under annual policies issued by Mid-Century Insurance Company (Mid-Century) that covered "direct loss" from employee dishonesty, so long as the loss was discovered within one year from the end of the policy period. Notwithstanding that one-year discovery period, the "employee dishonesty" coverage also included what is known as a "prior insurance" provision, whereby Mid-Century agreed to pay for losses that occurred "during the period of any prior insurance" and that would have been covered "except that the time within which to discover loss or damage had expired."
The primary questions on appeal concern two different aspects of that employee dishonesty coverage. First, the parties disagree over the operation of the prior insurance provision. Summit argues that it provides continuous coverage for undiscovered losses dating back through multiple policy periods, while Mid-Century argues that "prior insurance" means immediately prior-in effect, a one-year lookback to the preceding annual policy period. Second, Summit argues that it was entitled to recover the costs of using its own employees and an outside audit to document its insurance claim, while Mid-Century contends that those costs were not "direct losses" within the meaning of the policies. The trial court agreed with Mid-Century on both issues, granted summary judgment in its favor, and denied Summit's cross-motion for summary judgment. We, too, agree with Mid-Century's construction of the policies, and we affirm the judgment.
We view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the party against whom summary judgment was granted-in this case, Summit. See OHSU v. Oregonian Publishing Co., LLC , 362 Or. 68, 78-79, 403 P.3d 732 (2017) (applying that standard when reviewing the grant of summary judgment in the context of cross-motions). Because this appeal turns primarily on the meaning of provisions *167 in insurance policies, which is a question of law, a relatively brief summary of the pertinent facts suffices to frame the issues.
Summit is a real estate management and investment company. For nearly 20 years prior to the events giving rise to this action, Summit had worked with Mid-Century's authorized agent, Nielsen Insurance, Inc. (Nielsen), to procure insurance for Summit's business. Among other types of insurance, Summit and Nielsen discussed coverage for acts of employee dishonesty.
In 2004, Nielsen procured that type of coverage for Summit under a multi-peril policy numbered 03494-37-34, which described explicitly a "policy period" that ran from August 1, 2004, to August 1, 2005. Given that, the declarations then stated,
"This policy will continue for successive policy periods as follows: If we elect to continue this insurance, we will renew this policy if you pay the required renewal premium for each successive policy period subject to our premiums, rules and forms then in effect."
(Boldface in original.) For the next three years, Summit paid the renewal premium and obtained employee dishonesty coverage under that same policy form (the "2004-08 Policy Form").
Beginning on August 1, 2008, Nielsen procured insurance for Summit under Mid-Century *907 Policy Number 60466-70-72, which utilized a different multi-peril policy form. Like the previous form, the declarations in each successive year described a 12-month "policy period," then stated that the policy would continue for successive policy periods if renewed. Summit paid the renewal premiums and, for annual periods through August 1, 2013, obtained "employee dishonesty" coverage as an additional "optional coverage" under that multi-peril policy form (the "2008-13 Policy Form").
The 2008-13 Policy Form, which we later discuss in greater detail, provides that Mid-Century will "pay for direct loss of or damage to Business Personal Property and 'money' and 'securities' resulting from dishonest acts *168 committed by any of your employees acting alone or in collusion with other persons," but that Mid-Century will "pay only for covered loss or damage discovered no later than one year from the end of the Policy Period." Those provisions are then followed by a paragraph governing "prior insurance." That paragraph obligates Mid-Century to pay for loss sustained "during the period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired," if (1) the optional employee dishonesty coverage "became effective at the time of cancellation or termination of the prior insurance" and (2) the loss would have been covered if the optional coverage had "been in effect when the acts or events causing the loss or damage were committed or occurred."
In July 2013, Summit discovered that its bookkeeper, Rodney Chun, had been embezzling from the company. Summit immediately notified Nielsen, which in turn notified Mid-Century of Summit's claim of loss resulting from employee dishonesty. Mid-Century informed Summit that it would need to provide documentation verifying the embezzlement loss, and Nielsen advised Summit that an audit by an accounting firm would be the best and most effective means of complying with the documentation requirement. Summit engaged Williamson & Associates, LLP, an accounting firm, to perform an audit to determine the scope of the embezzlement. The audit determined that, between February 2005 and July 2013, Chun had stolen at least $ 856,700.
Summit submitted a formal proof of loss to Mid-Century, including a copy of the audit report. Summit sought reimbursement for the $ 856,700 that had been embezzled, for $ 25,245 that it paid for the audit, and for $ 8,000 in employee time spent investigating the embezzlement and assisting Williamson & Associates with the audit.
In response, Mid-Century agreed to cover $ 327,600 of Summit's claim, representing payment only for those funds that were embezzled after August 1, 2010. Mid-Century determined that, because the embezzlement was not discovered until July 2013, two policies had been implicated by "loss or damage discovered no later than one year *169 from the end of the Policy Period": the policy in effect from August 1, 2011 to August 1, 2012, and the policy in effect from August 1, 2012 to August 1, 2013. Mid-Century agreed to pay for losses that occurred during those periods and further agreed that, under the prior insurance provision in the policy in effect from August 1, 2011 to August 1, 2012, Summit was also entitled to recover for losses that would have been covered under insurance in effect for the policy period from August 1, 2010 to August 1, 2011. Mid-Century denied coverage for any embezzlement that occurred in previous policy periods (i.e. , everything before August 1, 2010). Mid-Century also denied coverage for the amounts Summit sought for the audit and for its own employee time; as for those amounts, Mid-Century told Summit that "there is no coverage provided in the policy for your expenses in order to determine the amount of your loss. The [employee dishonesty coverage] only covers the direct loss" whereas "[y]our expenses are the indirect costs related in determining the amount of your claim."
Summit initiated this action to recover the unreimbursed parts of its claim.[1] The parties eventually filed cross-motions for summary judgment in which they advanced opposing *908 views of the coverage under the various policies. Summit argued (1) that the policy provisions on which Mid-Century relied to restrict coverage were "invalid and unenforceable" because they violated ORS 742.246(2), which states that "[a]ny provision restricting or abridging the rights of the insured under the policy must be preceded by a sufficiently explanatory title printed or written in type not smaller than eight-point capital letters"; (2) even if valid and enforceable, the prior insurance provision was ambiguous and should therefore be interpreted to continuously extend the discovery period for employee dishonesty; (3) if not ambiguous in that regard, the policies should nonetheless be treated as providing continuous coverage based on representations by Nielsen, which were binding on Mid-Century; and (4) in any event, expenses incurred by Summit in verifying its losses were "very much a 'direct loss' resulting from *170 Mr. Chun's embezzlement" that Mid-Century was obligated to cover.
Mid-Century, on the other hand, argued that the requirement of an explanatory title under ORS 742.246(2) was inapplicable to the employee dishonesty coverage; that the policies unambiguously restricted coverage based on when the losses were discovered; that Nielsen made no representations to support an "insurance by estoppel" theory; and that Summit's investigative costs were not the "direct loss of 'money' " within the meaning of the employee dishonesty coverage. The trial court agreed with Mid-Century in each of those respects, and it granted summary judgment in its favor and denied Summit's cross-motion.
Summit appeals the resulting judgment, assigning error to the trial court's rulings on the cross-motions and reprising the arguments it made below. We address each in turn, reviewing for whether "there are any disputed issues of material fact and whether either party is entitled to judgment as a matter of law." OHSU , 362 Or. at 78, 403 P.3d 732.
We begin with Summit's contention that the coverage limitations, on which Mid-Century relied-including the limitation that Mid-Century will pay "only for loss or damage you sustain through acts committed or events occurring during the Policy Period"-are unenforceable as a matter of law under ORS 742.246. That statute provides, in full:
"(1) A fire insurer may add to the provisions required by ORS 742.202 other conditions, provisions and agreements not in conflict with law or contrary to public policy.
"(2) Any provision restricting or abridging the rights of the insured under the policy must be preceded by a sufficiently explanatory title printed or written in type not smaller than eight-point capital letters.
"(3) This section applies only to standard fire insurance policies as described in ORS 742.202 and does not apply to any other insurance policies."
(Emphasis added.) Relying on subsection (2), Summit argues that it is undisputed that the policy limitations on employee *171 dishonesty coverage violate the statute because they "are preceded by no explanatory title, much less one that is printed in type not smaller than eight-point capital letters." (Emphasis by Summit.)
The problem with that argument, as Mid-Century points out, is subsection (3), which expressly states that ORS 742.246 applies "only to standard fire insurance policies as described in ORS 742.202 and does not apply to any other insurance policies." The policies that Mid-Century issued to Summit are not standard fire insurance policies as described in ORS 742.202, but rather multi-peril insurance policies-a point that Summit does not dispute. See ORS 742.202 (stating that, except as provided in ORS 742.204, a fire insurance policy must "contain[ ] the provisions set forth in ORS 742.206 to 742.242, which shall form a portion of the contract between the insurer and the insured").
Summit offers no plausible construction of ORS 742.246 that overcomes subsection (3). See State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009) (explaining that we discern the legislature's intent by examining the text of the statutes in context, along with legislative history). But, even assuming that we could find some ambiguity in the text of ORS 742.246 itself, the context and history of the *909 statute remove any doubt about its reach. See Schutz v. La Costita III, Inc. , 364 Or. 536, 548, 436 P.3d 776 (2019) (context includes case law leading to the adoption of the changes).
The limitation in subsection (3) of the statute was enacted in 2001, directly in response to Fleming v. United Services Automobile Assn. , 330 Or. 62, 996 P.2d 501 (2000). In that case, the Supreme Court held that the "sufficiently explanatory title" requirement in ORS 742.246(2) applied to multi-peril insurance policies; the court explained that the insurer's contrary argument would "subject standard fire insurance policy forms to the requirements in ORS 742.246(2), but would exempt complex, multi-peril policy forms from those requirements." Id. at 70, 996 P.2d 501. The court further explained that a related statute, ORS 742.204, exempted multi-peril insurance policies from certain requirements but not the requirements of ORS 742.246(2). The court declined to "insert into ORS 742.204 an exemption that it does not *172 contain, namely, an exemption for multi-peril policy forms from the requirements in ORS 742.246(2)." Id. at 69, 996 P.2d 501.
The following legislative session, the legislature introduced Senate Bill (SB) 440 to overturn that result. See , e.g. , Audio Recording, Senate Floor Debate, SB 440, Mar. 7, 2001, at 51:25 (statement of Sen. Tony Corcoran explaining that the bill was in response to Fleming and was intended to make "clear that the statutory scheme interpreted by the court would apply only to standard fire policies"), http://records.sos.state.or.us/ORSOSWebDrawer/Record/4157286# (accessed May 9, 2019). The bill, which was enacted as Oregon Laws 2001, chapter 85, accomplished that objective through two statutory changes regarding ORS 742.246. First, it inserted into ORS 742.204 the exemption from ORS 742.246 that the court in Fleming concluded was lacking; and, second, it amended ORS 742.246 by adding what is now subsection (3), which limits the reach of ORS 742.246 to "standard fire insurance policies as described in ORS 742.202." In light of those 2001 amendments and their manifest purpose to limit the application of the explanatory title requirement, we reject Summit's contention that the coverage limitations in the multi-peril policies in this case are invalid or unenforceable under ORS 742.246(2). That statute does not apply.
We turn to the substance of the coverage limitations. It is undisputed that Summit did not discover Chun's embezzlement until July 2013, more than a year after the end of the policy periods for all but two of the policies. However, Summit argues that it is entitled to coverage for losses in all of the earlier policy periods based on a provision in the policies concerning prior insurance. Paragraph h of the employee dishonesty coverage in the 2008-13 Policy Form provides:
"If you (or any predecessor in interest) sustained loss or damage during the period of any prior insurance that you could have recovered under that insurance except that the time within which to discover loss or damage had expired, we will pay for it under this Optional Coverage, provided:
"(1) This Optional Coverage became effective at the time of cancellation or termination of the prior insurance; and *173 "(2) The loss or damage would have been covered by this Optional Coverage had it been in effect when the acts or events causing the loss or damage were committed or occurred."
In Summit's view, that paragraph means that "as long as the insured continues to maintain 'Employee Dishonesty' coverage at the conclusion of each policy period, Mid-Century will continue to provide such coverage to the insured without interruption." According to Summit, that is how courts in other jurisdictions have interpreted analogous prior insurance provisions. The trial court disagreed with that view, concluding, as Mid-Century had argued, that "any prior insurance" referred to the policy period immediately preceding the policy that had been triggered.
The parties' dispute over the meaning of the policy terms presents a question of law. Hoffman Construction Co. v. Fred S. James & Co. , 313 Or. 464, 469, 836 P.2d 703 (1992). We recently summarized our interpretive process as follows:
*910 "We interpret the terms of the policy from the perspective of an ordinary purchaser of insurance. When a particular word or phrase is not defined in an insurance policy, we first ask whether the word or phrase has a plain meaning-i.e. , whether it is susceptible to only one plausible interpretation. An interpretation is plausible if it is sensible and reasonable under the circumstances. If there is more than one plausible interpretation, we examine the word or phrase in the context in which it is used in the policy and the broader context of the policy as a whole. If the ambiguity persists at that point-that is, if two or more plausible interpretations remain-any reasonable doubt as to the meaning of the word or phrase will be resolved in favor of the insured and against the insurer."
Bighorn Logging Corp. v. Truck Ins. Exchange , 295 Or. App. 819, 828-29, 437 P.3d 287 (2019) (internal quotation marks and citations omitted).
Focusing on certain isolated text in paragraph h, we agree with Summit that the phrase "any prior insurance" is broad and without temporal limitation. See generally Webster's Third New Int'l Dictionary 97 (unabridged ed. 2002) (including, as definitions of "any," "unlimited in amount, quantity, number, time, or extent" and "up to whatever *174 measure may be needed or desired"). But we do not interpret that phrase in isolation, removed from the remainder of the operative provision. Contextually, subparagraph (1) imposes an explicit temporal limitation on what prior insurance is covered by paragraph h. That subparagraph limits the application of the paragraph to circumstances in which the "Optional Coverage" for employee dishonesty "became effective at the time of cancellation or termination of the prior insurance ."
That subparagraph plainly contemplates that the "Optional Coverage" is displacing whatever "prior insurance" had just terminated. In context, "cancellation or termination of the prior insurance" only makes sense as a reference to insurance for a policy period that terminates when the period for the Optional Coverage begins. Otherwise, the coverage in paragraph h would never be triggered in the case of an insured who maintained continuous coverage under the same policy form. That is because, employing Summit's reasoning, there would be no "cancellation or termination of the prior insurance" in the first instance-the very predicate for prior insurance coverage under paragraph h. Accord. Robben & Sons Heating v. Mid-Century Ins. Co. , 189 Or. App. 153, 158, 74 P.3d 1141, rev. den. , 336 Or. 192, 82 P.3d 626 (2003) (concluding, when interpreting a similarly worded policy, that "renewal of a policy is intended to create a new insurance contract, discrete from the contract for the previous policy period").
Summit points to decisions from other jurisdictions that have understood or applied prior insurance provisions to offer broader embezzlement coverage, which Summit argues is, at the very least, evidence that paragraph h is ambiguous.[2] Summit also cites a statement in American Jurisprudence to the effect that an extension of coverage *175 provision for dishonesty loss during a period of prior insurance "continuously extends the discovery clause through each successive policy period; thus, the insured would have coverage for losses that occurred during the period of prior policies that expired more than one year before." Fidelity Bonds and Insurance , 35A Am. Jur. 2d § 74 (2016) (citing Universal Underwriters Ins. Co. v. Buddy Jones Ford Lincoln-Mercury, Inc. , 734 So. 2d 173, 179 (Miss. 1999) ).
Despite generalized statements of the principles of insurance coverage, our task in this case is to interpret the particular text of *911 paragraph h. Consequently, the sources cited by Summit are of limited assistance. Only one of those cases-an unreported district court decision from Rhode Island, involves the same policy language as paragraph h, and that decision does not engage in an interpretation of the relevant text. See Armbrust Int'l, Ltd. v. Travelers Cas. & Sur. Co. of Am. , C.A. 04-212 ML, 2006 WL 1207659, at *10 (DRI May 1, 2006).[3] The rest of the cases involve materially different policy language or, in the case of arguably analogous language, do not engage in the type of textual and contextual analysis required by Oregon law. In short, none of the cases cited by Summit persuade us that its construction of paragraph h, and particularly, subparagraph (1), is a plausible one. Therefore, we affirm the trial court's ruling on summary judgment that the loss implicated no more than three policy periods-2010-11, 2011-12, and 2012-13.
Having concluded that the coverage provided in paragraph h is temporally limited in the way that Mid-Century asserts, we turn but briefly to Summit's contention that it nevertheless is entitled to broader coverage because of representations made by Nielsen, Summit's authorized agent. According to Summit, Nielsen represented to Summit that, "if one of its employees stole money from Summit during any period in which 'Employee Dishonesty' coverage *176 was purchased, then Summit would have coverage for the amount stolen by the employee during that policy period" up to the annual limit of liability that had been obtained for that policy period; and "no mention was ever made by Nielsen of any limits or restrictions (whether temporal or otherwise) on the scope of the 'Employee Dishonesty' coverage that was being provided to Summit."
By not mentioning those particular restrictions or limitations, Summit argues, Nielsen bound Mid-Century to coverage without them. See ORS 742.043(1) (stating that "[b]inders or other contracts for temporary insurance may be made orally or in writing" and "shall be deemed to include all the usual terms of the policy as to which the binder was given together with such applicable indorsements as are designated in the binder, except as superseded by the clear and express terms of the binder " (emphasis added)); ORS 742.043(2) (stating that a written policy shall be issued in lieu of a binder, "including within its terms the identical insurance bound under the binder and the premium therefor").
As Mid-Century points out, however, the statements by Nielsen on which Summit relies are a far cry from the types of oral representations that will create coverage terms not reflected in the written policy. In Stuart v. Pittman , 350 Or. 410, 419, 255 P.3d 482 (2011), the court explained that, for purposes of an oral binder under ORS 742.043, the term "clear" means "easily understood" and the term "express" means "directly and distinctly stated, rather than implied or left to inference." (Internal citation omitted.) The representations by Nielsen, viewed in the light most favorable to Summit, create no more than inferences or implications about when loss must be discovered or how coverage carries over from policy period to policy period. That is insufficient, as a matter of law, to bind an insurer to terms that are inconsistent with the written policy. See ORS 742.016(1) ("Except as provided in ORS 742.043, every contract of insurance shall be construed according to the terms and conditions of the policy."). The oral representations provide no basis for reversing the trial court's grant of summary judgment.
*177 Finally, we turn to the question whether Mid-Century was obligated to pay for the costs Summit incurred in substantiating its claim for embezzlement losses. The 2008-13 Policy Form provides that Mid-Century will "pay for direct loss of or damage to Business Personal Property and 'money' and 'securities' resulting from dishonest acts *912 committed by any of your employees acting alone or in collusion with other persons." Summit argues that, under Oregon law, a loss is a "direct loss" if it is a natural consequence of the incident. In its view, "the expenses incurred by Summit to verify the amount of its embezzlement loss were unquestionably a natural consequence of Mr. Chun's embezzlement" and therefore must be reimbursed by Mid-Century.
The trial court rejected that contention and explained:
"Even accepting that elaboration on the policy's wording, it does not appear that the requested expenses are a natural consequence or direct loss resulting from Chun's embezzlement. Summit could have chosen to provide the 'documentation' that [Mid-Century] requested in various ways. [Mid-Century] left it up to Summit to select how to meet that request. Summit chose to engage the accounting firm and to deploy staff to investigate the scope of the claim. When Chun completed his misdeeds, it was not certain or even probable that the requested expenses would be natural consequences of the embezzlement. Summit cannot shift to MIC the expense of the particular methods that it chose to employ to document the extent of Chun's dishonesty."
The question on appeal-whether "direct loss" includes Summit's expenditures in substantiating its insurance claim-presents another question of policy interpretation. As summarized earlier, we examine the ordinary meaning of the phrase "direct loss" and, if it is ambiguous, examine it in the context in which it is used in the policy as a whole. Bighorn Logging Corp. , 295 Or. App. at 828-29, 437 P.3d 287.
We consider that the plain meaning of the phrase "direct loss" refers to a proximate, rather than remote, relationship between the covered acts of employee dishonesty and the resulting loss or damage. The adjective "direct" means "characterized by or giving evidence of a close esp. logical, causal, or consequential relationship ." Webster's at *178 640 (emphasis added).[4] The noun "loss," used in the insurance context, ordinarily means "the amount of an insured's financial detriment due to the occurrence of a stipulated contingent event (as death, injury, destruction or damage) in such a manner as to charge the insurer with a liability under the terms of the policy." Id. at 1338.
When used in conjunction, the term "direct loss" ordinarily refers to the type of close causal relationship that is distinguished from remote or "consequential loss." See Black's Law Dictionary 1030 (9th ed. 2009) (defining "direct loss" as "[a] loss that results immediately and proximately from an event. Cf. consequential loss ." (Italics in original.)); Steven Plitt et al. , 10A Couch on Insurance § 148.60 (3rd ed. June 2019 Update) ("In a provision in a policy insuring against direct loss and damage caused solely by a particular cause, the word 'direct' means merely 'immediate' or 'proximate' as distinguished from 'remote.' "). A "consequential loss," by contrast, refers to "[a] loss arising from the results of damage rather than from the damage itself." Black's Law Dictionary at 1030 (explaining that "consequential loss" is also termed "indirect loss").
That meaning of the term "direct loss"-loss resulting immediately and proximately from an event rather than resulting from the damage-is consistent with how the term is used in its broader context in the policy as a whole. The policy refers to payment "for direct loss of or damage to Business Personal Property and 'money' and 'securities' resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons." The only reasonable and sensible interpretation of the term "direct loss," in that broader context, is that Mid-Century is insuring against loss of or damage to the property, money, and securities that results from the dishonest acts, not losses that result from the damage from those dishonest acts.[5]
*179 With that understanding, we agree with the trial court's conclusion that Summit's *913 costs to substantiate its claim were not the "direct loss of or damage to * * * 'money' * * * resulting from dishonest acts committed by any of [its] employees." Those expenditures did not represent losses proximately caused by the embezzlement but instead were expended as a result of the damage-that is, as a part of Summit's efforts to document the loss in a way that Mid-Century would be sure to cover it. As the trial court reasoned, "[w]hen Chun completed his misdeeds, it was not certain or even probable that the requested expenses would be natural consequences of the embezzlement." Accordingly, the trial court properly determined, on these facts, that Summit's direct losses were the embezzled sums themselves and not the expenses of accounting or employee labor.
In sum, we conclude that the trial court did not err in granting Mid-Century's motion and denying Summit's cross-motion for summary judgment.
Affirmed.

Summit named Mid-Century and Nielsen as defendants but later voluntarily dismissed its claim against Nielsen, which is not a party on appeal.

Summit cites Times-Picayune Publishing Corp. v. Am. Ins. Co., 421 F.3d 328 (5th Cir. 2005) ; Brigham Young Univ. v. Lumbermens Mut. Cas. Co., 965 F.2d 830 (10th Cir. 1992) ; Armbrust Int'l, Ltd. v. Travelers Cas. & Sur. Co. of Am., C.A. 04-212 ML, 2006 WL 1207659, at *10 (DRI May 1, 2006) ; White Diary Co., Inc. v. St. Paul Fire & Marine Insurance Co., 222 F. Supp. 1014, 1017-18 (N.D. Ala. 1963) ; Cincinnati Ins. Co. v. Hopkins Sporting Goods, Inc., 522 N.W. 2d 837, 839 (Iowa 1994) ; Universal Underwriters Ins. Co. v. Buddy Jones Ford Lincoln-Mercury, Inc., 734 So. 2d 173, 179 (Miss. 1999). Summit acknowledges that there are also cases that have interpreted prior insurance provisions consistently with Mid-Century's position.

In Armbrust Int'l, Ltd. , the court ultimately ruled that "the language of this 'Prior Insurance' provision clearly requires that the prior insurance terminate or cancel before the current policy becomes effective," and then found that an earlier annual policy, which overlapped with the start of the current policy, had not "terminated" in time to trigger prior insurance coverage. 2006 WL 1207659, at *10-11. The court was not required to engage in the interpretive task that this case presents.

See Webster's at 640 (further defining "direct" as "proceeding from one point to another in time or space without deviation or interruption : not crooked, oblique, reflected, refracted or circuitous"; "operating or guided without digression or obstruction" or "stemming immediately from a source"; "marked by absence of an intervening agency, instrumentality, or influence").

Summit directs us to Frontline Processing Corp. v. American Econ. Inc. Co. , 335 Mont. 192, 149 P.3d 906 (Mont. 2006), in which the Montana court considered a certified question from the Ninth Circuit in a dispute over whether the insured's expenses for investigation and mitigation of embezzlement were "direct losses." That court concluded that "the term 'direct loss' when used in the context of employee dishonesty coverage * * * applies to consequential damages incurred by the insured that were proximately caused by the alleged dishonesty." Id. at 200, 149 P.3d 906. However, the court declined to "address or resolve the question whether all of the claims presented by [the insured] for payment under the policy were proximately caused by the dishonest actions of [the embezzler], as this is beyond the scope of the certified question." Using somewhat different terminology, we determine that "direct loss" refers to losses proximately caused by the dishonest acts; but, we reach the further question, which was not decided in Frontline , whether Summit's expenses to document its insurance claim were proximately caused by Chun's actions.